IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF IOWA
CENTRAL DIVISION

| | |
|---|---|
| JACQUELINE LOEW,<br><br>    Plaintiff,<br><br>vs.<br><br>SAYDEL COMMUNITY SCHOOL DISTRICT and KEVIN SCHULTE,<br><br>    Defendants. | Case No. 4:22-cv-00250<br><br><br>**AMENDED PETITION<br>AND<br>JURY DEMAND** |

COMES NOW the Plaintiff, Jacqueline Loew, and states the following for her cause of action against Defendants:

**INTRODUCTION**

1. This is an action under Title VII of the Civil Rights Act of 1964, the Family and Medical Leave Act, the Americans with Disabilities Act, and the Iowa Civil Rights Act, challenging Defendants' illegal sex and/or gender discrimination, disability discrimination, and retaliation against Plaintiff.

2. Plaintiff Jacqueline Loew is a resident of San Luis Obispo County, California.

3. Defendant Saydel Community School District is an educational institution located in Polk County, Iowa.

4. Defendant Kevin Schulte is believed to be a resident of Polk County, Iowa.

5. The acts of which Plaintiff complains occurred in Polk County, Iowa.

## PROCEDURAL REQUIREMENTS

6. On October 20, 2021, within 300 days of the acts of which she complains, Plaintiff filed charges of sex discrimination and retaliation against Defendants with the Iowa Civil Rights Commission.

7. On April 20, 2022, less than 90 days prior to the filing of this Petition and Jury Demand, the Iowa Civil Rights Commission issued a Right to Sue Letter and administrative release with respect to Plaintiff's charges.

8. On June 10, 2022, within 300 days of the acts of which she complains, Plaintiff filed a second charge of sex discrimination, disability discrimination, and retaliation against Defendants with the Iowa Civil Rights Commission.

9. On December 19, 2022, less than 90 days prior to the filing of this Amended Petition and Jury Demand, the Iowa Civil Rights Commission issued a Right to Sue Letter and administrative release with respect to Plaintiff's second charge.

## BACKGROUND FACTS

10. Plaintiff Jacqueline ("Jackie") Loew began working for Defendant Saydel Community School District ("Saydel") as a High School English Teacher in August 2019.

11. In addition to high Sophomore English classes, Jackie also taught upper-level English Advanced Placement ("AP") courses.

12. Defendant Principal Kevin Schulte was Jackie's direct supervisor.

13. In February 2021, because of the changes experienced during the COVID-19 pandemic and hybrid model classes, Schulte required AP teachers, including Jackie, to host extra study sessions for AP students.

14. Jackie scheduled a meeting with Schulte and her Union Representative to discuss the extra AP study sessions.

15. Jackie asked Schulte if she would be compensated for the extra time for planning and holding additional AP study sessions outside of her contracted hours.

16. Schulte told Jackie she would not be compensated and needed to work the lessons into her contract hours and plan them on her own time.

17. Shortly after this meeting, Jackie discovered Schulte had offered the two male AP teachers the ability to complete the extra AP sessions outside of contract hours and receive additional compensation for their time.

18. Jackie assumed Schulte had changed his mind about compensation and emailed to ask again about the expectations for the study sessions.

19. Jackie told Schulte she knew the male AP teachers were being offered additional pay for the same duties being asked of her.

20. Schulte responded to the email with Saydel Superintendent Todd Martin and Human Resources Representative Kristi Powers included in his reply, asking if Jackie was accusing him of sex discrimination.

21. Jackie responded she was not accusing him of anything but wanted to be sure she was being treated fairly and receiving equal pay for equal work.

22. Schulte told Jackie he wanted to meet in person to discuss "insights" into the things he sees while working with Jackie.

23. On March 10, 2021, Schulte held a meeting with Jackie.

24. During this meeting, Schulte told Jackie he wanted to share his feelings with her about how he felt he was being accused of sex discrimination.

25. Schulte claimed they had not discussed working outside of contract hours that qualified for extra pay.

26. Jackie clarified she did not refuse to work outside of contract hours; she just did not want to work outside of contract hours for free.

27. Schulte then brought up Jackie's previous request for a letter of recommendation and told Jackie that after her complaint of sex discrimination, he could no longer give her a recommendation – or at least one that she would "want to use."

28. Schulte proceeded to criticize Jackie and told her she needed to be more mindful because he felt she came off as abrasive.[1]

29. On May 4, Jackie asked to meet with Schulte again to discuss some issues within the English Department.

30. Schulte asked Jackie if she was recording the conversation.

31. Jackie responded that yes, she was recording the meeting for her own protection.

32. Jackie's answer upset Schulte.

33. Schulte proceeded to lecture Jackie on the value of trust, told her he did not trust her, was concerned about their professional relationship, and abruptly ended the meeting.

34. On May 12, Jackie attended a meeting with Superintendent Martin, Ms. Powers, and her Union Representative to discuss her complaint of sex discrimination against Schulte.

35. Jackie told Superintendent Martin that Schulte had been painting a false narrative of her with the other staff, retaliating against her, and treating her unprofessionally.

---

[1] Women are often subjected to gender bias and double standards in the workplace. While men are often praised for being "aggressive" with their goals or "persistent," women with similar attributes are viewed negatively and are described as "abrasive." Andrus, Joel & Dave Sullivan, *Changing the Tide: Reducing Gender Bias at Work*, ROBERT J. TRULASKE, SR. COLL. OF BUS. (October 29, 2021) https://business.missouri.edu/about/news/changing-tide-reducing-gender-bias-work (". . . 66% of women are told in performance reviews that they are abrasive, while just 1% of men are given similar feedback.").

36. Jackie complained about Schulte interrupting her classes by pulling her students out and questioning them about her.

37. Jackie requested another administrator complete her upcoming summative evaluation due to the breakdown of the relationship with Schulte.

38. Superintendent Martin assured Jackie that Schulte would not be completing her summative evaluation.

39. On May 13, Schulte emailed Jackie about her summative evaluation and told her Assistant Principal Alex Stubbers would take his place in completing the evaluation he'd begun.

40. Stubbers is Schulte's cousin.

41. Stubbers refused to complete Jackie's summative evaluation unless she started the evaluation process over completely.

42. Due to the proximity to the end of the school year, it was not feasible or fair to start the evaluation process over again.

43. Because of Stubbers' refusal, Schulte completed Jackie's summative evaluation.

44. On May 17, Jackie met with Ms. Powers to discuss the summative evaluation Schulte completed.

45. Schulte included statements in Jackie's evaluation that her colleagues had "expressed concern about being able to collaborate," and Jackie needed to be more aware of how her delivery impacts the dynamics with her colleagues.

46. These statements were direct retaliation for Jackie's complaints about inequitable pay and Principal Schulte.

47. Ms. Powers asked if anything had changed with Schulte between March and the timing of the summative evaluation.

48. Jackie explained to Ms. Powers again the retaliation she'd been experiencing since her complaint.

49. Jackie told Ms. Powers that Schulte's comments in her summative evaluation were demoralizing, and the characterizations were unfair and inaccurate.

50. Ms. Powers advised Jackie of Saydel's grievance process and policies.

51. On May 28, Jackie filed a formal grievance against Schulte for his retaliation and harassment of her for bringing forth claims of unequal pay discrimination.

52. On June 2, Equity Coordinator Aimee Rhode interviewed Jackie in response to her grievance.

53. Jackie relayed all the issues with Schulte's retaliation and not treating her, or offering to pay her, equally.

54. Rhodes's final investigative report acknowledged Schulte's retaliation.

55. However, the report blamed Jackie for Schulte's retaliation due to her complaints about Schulte's sex discrimination and retaliation and recording their conversations.

56. Schulte's statement during the investigation contained admissions that he lied about Jackie being abrasive and aggressive and admitted that the tension grew when he found out Jackie had recorded conversations to protect herself.

57. Saydel did not punish Schulte or otherwise remedy the situation after the investigation concluded Schulte had retaliated against Jackie.

58. Due to the lack of response, Jackie appealed the investigation decision.

59. On September 4, Jackie received the final report.

60. Saydel continued to ignore Schulte's harassment and retaliation of Jackie.

61. In August 2021, Jackie began taking care of her father, another Saydel High School employee, full-time at her home as he transitioned into hospice care.

62. During this time of Jackie's FMLA leave, Schulte ignored Jackie's emails and refused to communicate with her.

63. Jackie continued to write substitute plans to avoid being fired while trying to spend precious time with her father in his final days.

64. Ms. Powers had informed Schulte that Jackie did not need to complete substitute plans while her father was dying.

65. Schulte deliberately withheld this information from Jackie.

66. On September 29, Schulte admitted to Jackie he had been avoiding her since April and did not support her while her father was dying.

67. Schulte's avoidance, ignoring Jackie, failing to communicate with her, and retaliation was in response to Jackie's repeated complaints about Schulte's gender discrimination and retaliation.

68. On October 8, Jackie went on Family Medical Leave Act (FMLA) leave due to the extreme anxiety she experienced due to Schulte's constant hostility, harassment, and retaliation.

69. On October 21, Jackie returned to work.

70. Upon her return, Schulte continued pulling Jackie's students out of her classroom to interrogate them with leading questions about her and her teaching.

71. Schulte's action of pulling students out of Jackie's classes disrupted her ability to teach and caused fear and discomfort for her students.

72. Schulte perpetuated issues within Jackie's department by meeting with her coworkers to misrepresent her and her character.

73. On October 26, Jackie's doctor doubled the dosage of her anxiety medications because she observed Schulte's retaliatory treatment at work was worsening Jackie's condition.

74. On October 27, Jackie spoke with Kimberly Poe ("Poe"), another English teacher, to discuss Schulte's claim that Poe had said Jackie was abrasive, intimidating, and that she needed Schulte to protect her from Jackie.

75. Poe told Jackie she did not go to Schulte with any issues regarding Jackie.

76. Poe further confided she felt used by Schulte and feared getting "roped into the drama."

77. On November 4, one of Jackie's students reported to her that Schulte had pulled her into the office that morning to ask if there was a teacher who called another teacher racist either this year or last year.

78. Jackie's student told her the questioning immediately made her think of Schulte's questioning of Jackie the previous school year and said, "I knew he was coming after [Jackie] again."

79. On November 11, Jackie took the day off under FMLA again due to increased anxiety symptoms.

80. On November 12, Saydel High School was closed due to staffing deficits, but Schulte required the staff to come in.

81. When Jackie arrived in her classroom, Schulte was there with another teacher, Carly Wallace ("Wallace").

82. Schulte did not acknowledge Jackie as she came into her classroom.

83. Schulte finished his conversation with Wallace, engaged in some small talk with Jackie, and then left.

84. Jackie sent Schulte a follow-up email, asking if he needed anything.

85. Schulte did not respond until the end of the day and claimed he was looking for Wallace.

86. Wallace had her own classroom where she could have been found if Schulte was truly looking for her.

87. Schulte was visiting each classroom that day asking about Standards Reference Grading and asking whether anyone needed additional support or resources from the school.

88. Schulte did not engage in the same inquiry or offer of support with Jackie.

89. On November 15, Jackie's doctor prescribed her additional medication to treat her increased PTSD symptoms that developed based on Schulte's persistent harassment and retaliation against Jackie.

90. On November 16, Stubbers scheduled a meeting with Jackie to discuss concerns from an "anonymous student."

91. The alleged concerns aligned with the questions Schulte had been asking Jackie's students when he pulled them from class.

92. Jackie reported to the Saydel Counselor and ISEA Representative, Shannon Larson ("Larson"), that she felt something strange was happening because Schulte had been interviewing and interrogating her students on similar topics.

93. Larson spoke with Stubbers prior to the meeting, reiterating what Jackie reported.

94. During the scheduled meeting, Stubbers changed the topic and told Jackie she needed to come to him when students share feelings about how administration is treating them.

95. On November 17, Schulte came into Jackie's classroom and accused her of being unprofessional, crossing ethical boundaries, and putting herself in a precarious situation due to a dinner she'd attended with her AP Literature students.

96. Schulte claimed the meal had nothing to do with school and was therefore inappropriate.

97. Jackie did not engage in unprofessional or unethical behavior.

98. The parents of Jackie's students knew about and consented to the dinner she attended, the students paid for their own dinners, and the students drove themselves to and from the event.

99. Other Saydel school clubs and sports teams frequently have similar meals outside of school.

100. Schulte did not accuse other teachers or coaches of being unprofessional or unethical after attending a meal with their students.

101. On November 18, one of Jackie's students told her Schulte had been questioning students about what having lunch in her classroom is like.

102. Jackie had several students who regularly came to her classroom for lunch because it was an environment they enjoyed and felt safe in.

103. Later that day, another teacher, Jory Nelson ("Nelson") told Jackie she'd had a meeting with Schulte where he made a pointed comment in response to hearing Jackie's name on her list of teachers that had helped her.

104. Schulte told Nelson something along the lines of, "As you develop in the teaching profession, the individuals that you surround yourself with drastically influence us," and "Surrounding yourself with positive people will help you with longevity in this profession."

105. Because this comment was made right after Jackie's name was brought up, Nelson believed it was aimed at Jackie.

106. On November 30, Jackie emailed Schulte again to ask if he could write a positive letter of recommendation.

107. On December 20, Schulte emailed Jackie a "recommendation letter."

108. However, the letter was poorly formatted and did not "recommend" Jackie in any capacity.

109. Schulte did not even include his title as High School Principal in the letter.

110. Schulte knew the letter would not allow Jackie to move up professionally in any other school district.

111. On February 7, 2022, Jackie went to the office to get the auditorium key for the Poetry Out Loud Competition she was running.

112. When Jackie requested the key, Schulte invented a procedure for "checking out" the key.

113. Schulte required Jackie to sign a sticky note for his secretary to make it "official" and instructed her to bring the key back as soon as the competition was over.

114. Schulte had not required any other teachers to "check out" the key to the auditorium before.

115. Schulte's secretary commented to Jackie that Schulte was acting very strangely with her.

116. On February 8, Schulte appeared in Jackie's classroom unannounced to pull a student from her classroom.

117. Schulte questioned the student about an incident that occurred during lunch, then shifted his questioning to what was going on in Jackie's class.

118. When the student returned, Schulte came in and stood at the back of the classroom.

119. Schulte stared down Jackie for approximately 15 minutes.

120. Jackie was uncomfortable and had difficulty continuing her lesson due to Schulte's intimidation.

121. Schulte eventually looked over the shoulder of a few students and left.

122. Jackie's students told her they were uncomfortable with Schulte in the room and were afraid they had done something wrong.

123. It was not normal practice for Schulte to appear in classrooms unannounced and watch the teacher give a lesson.

124. By this time, Jackie had extreme difficulty coming into work due to regular panic attacks before leaving her home in the morning due to Schulte's harassment, retaliation, and overall hostility.

125. On February 9, Jackie arrived less than five minutes late to a Professional Development session due to a stress-related panic attack she had before school.

126. After the session, Schulte followed Jackie and insisted she step out in the hall with him.

127. Schulte told Jackie he'd noticed she was having a hard time getting to school on time and wanted to know why.

128. Jackie started to cry and told Schulte she was suffering from severe anxiety.

129. Even though other teachers had come into the session around the same time Jackie did, Schulte did not confront any other teachers.

130. That afternoon, Jackie emailed Powers to inform her she was experiencing an increase in her symptoms and needed to use FMLA to see her doctor.

131. On February 10, Jackie visited her doctor to discuss taking additional time off at work because the symptoms of her PTSD and anxiety had increased again.

132. Jackie's doctor feared Jackie would have another mental health crisis and sent a letter to Saydel documenting Jackie's treatment for PTSD symptoms she'd been experiencing due to the ongoing harassment and toxic dynamics at work.

133. Jackie's doctor recommended another increase in Jackie's treatment due to her declining mental health.

134. On February 14, Jackie attended work as scheduled.

135. On February 15, Jackie suffered a panic attack during class and knew she could not continue working at Saydel.

136. On February 17, Jackie went on FMLA leave for the second time on the recommendation of her doctor due to extreme stress, anxiety, and PTSD at work.

137. On March 7, 2022, Saydel constructively discharged Jackie.

138. Principal Kevin Schulte was an employee and/or agent of Defendant Saydel Community School District, acting at all times within the scope of his employment or agency.

139. Aimee Rhode was an employee and/or agent of Defendant Saydel Community School District, acting at all times within the scope of her employment or agency.

**COUNT I**
**VIOLATION OF THE IOWA CIVIL RIGHTS ACT**
**SEX AND/OR GENDER DISCRIMINATION**

140. Plaintiff repleads paragraphs 1 through 139 as if fully set forth herein.

141. Plaintiff is a woman protected from discriminatory practices in the workplace pursuant to the Iowa Civil Rights Act.

142. Defendants subjected Plaintiff to harassment and discrimination on the basis of her sex.

143. Plaintiff's sex and/or gender was a motivating factor in Defendants' harassment and discrimination.

144. As a result of Defendants' acts and omissions, Plaintiff has in the past and will in the future suffer injuries and damages including but not limited to emotional distress, lost wages, and other benefits of employment.

WHEREFORE, Plaintiff demands judgment against Defendants, jointly and severally, in an amount which will fully and fairly compensate Plaintiff for her injuries and damages, for pre-judgment and post-judgment interest, for attorney fees and litigation expenses, for the costs of this action, for appropriate equitable and injunctive relief, and for such other relief as may be just in the circumstances and consistent with the purpose of the Iowa Civil Rights Act.

## COUNT II
## VIOLATION OF THE IOWA CIVIL RIGHTS ACT
## RETALIATION

145. Plaintiff repleads paragraphs 1 through 144 as if fully set forth herein.

146. Plaintiff opposed sex discrimination and other practices made unlawful by the Iowa Civil Rights Act.

147. Defendants retaliated against Plaintiff through persistent harassment and by constructively discharging her.

148. Plaintiff's opposition and/or resistance to sex discrimination was a motivating factor in Defendants' retaliation.

149. As a result of Defendant's acts and omissions, Plaintiff has in the past and will in the future suffer injuries and damages, including by not limited to emotional distress, lost wages, and other employment benefits.

WHEREFORE, Plaintiff demands judgment against Defendants, jointly and severally, in an amount which will fully and fairly compensate Plaintiff for her injuries and damages, for pre-judgment and post-judgment interest, for attorney fees and litigation expenses, for the costs of this action, for appropriate equitable and injunctive relief, and for such other relief as may be just in the circumstances and consistent with the purpose of the Iowa Civil Rights Act.

**COUNT III**
**VIOLATION OF TITLE VII OF THE CIVIL RIGHTS ACT OF 1964**
**SEX AND/OR GENDER DISCRIMINATION**

150. Plaintiff repleads paragraphs 1 through 149 as if fully set forth herein.

151. Defendants subjected Plaintiff to harassment and discrimination on the basis of her sex in violation of Title VII.

152. Plaintiff's sex and/or gender was a motivating factor in Defendants' acts and omissions.

153. Defendants acted with malice and reckless disregard for Plaintiff's federally protected rights.

154. As a result of Defendants' acts and omissions, Plaintiff has in the past and will in the future suffer injuries and damages including but not limited to emotional distress, lost wages, and other benefits of employment.

WHEREFORE, Plaintiff demands judgment against Defendants, jointly and severally, in an amount which will fully and fairly compensate her for her injuries and damages, for appropriate equitable and injunctive relief, for prejudgment and postjudgment interest, for attorney fees and

litigation expenses, for the costs of this action, for punitive damages, and for other such relief as may be just in the circumstances and consistent with the purposes of Title VII.

## COUNT IV
### VIOLATION OF TITLE VII OF THE CIVIL RIGHTS ACT OF 1964
### RETALIATION

155. Plaintiff repleads paragraphs 1 through 154 as if fully set forth herein.

156. Plaintiff complained to Defendants about sex and/or gender discrimination she experienced and otherwise opposed practices made unlawful by Title VII.

157. Defendants retaliated against Plaintiff.

158. Plaintiff's protected activity was a motivating factor in Defendants' acts and omissions.

159. Defendants acted with malice and reckless disregard for Plaintiff's federally protected rights.

160. As a result of Defendants' acts and omissions, Plaintiff has in the past and will in the future suffer injuries and damages including but not limited to emotional distress, lost wages, and other benefits of employment.

WHEREFORE, Plaintiff demands judgment against Defendants, jointly and severally, in an amount which will fully and fairly compensate her for her injuries and damages, for appropriate equitable and injunctive relief, for prejudgment and postjudgment interest, for attorney fees and litigation expenses, for the costs of this action, for punitive damages, and for other such relief as may be just in the circumstances and consistent with the purposes of Title VII.

## COUNT V
### VIOLATION OF THE IOWA CIVIL RIGHTS ACT
### DISABILITY DISCRIMINATION

161. Plaintiff repleads paragraphs 1 through 160 as if fully set forth herein.

162. Plaintiff suffered from one or more physical or mental impairments, including but not limited to depression, anxiety, and Post-Traumatic Stress Disorder (PTSD), which substantially limited one or more of her major life activities.

163. Plaintiff had a record of one or more physical or mental impairments, including but not limited to depression, anxiety, and PTSD, which substantially limited one or more of her major life activities.

164. Alternatively, Defendants perceived Plaintiff to be disabled.

165. Plaintiff was qualified for her position as an English Teacher.

166. Plaintiff could perform the essential functions of her position with or without reasonable accommodations.

167. Defendants discriminated against Plaintiff in employment, including but not limited to constructively discharging her.

168. Plaintiff's disability, record of disability, or Defendants' perception of her as disabled, was a motivating factor in Defendants' acts or omissions.

169. As a result of Defendants' acts and omissions, Plaintiff has in the past and will in the future suffer injuries and damages including, but not limited to, emotional distress and lost wages, benefits, future earnings, and other emoluments of employment.

WHEREFORE, Plaintiff demands judgment against Defendants, jointly and severally, in an amount which will fully and fairly compensate her for her injuries and damages, for prejudgment and postjudgment interest, for attorney's fees and expenses, for the costs of this action, for appropriate equitable and injunctive relief, and for such other relief as may be just in the circumstances and consistent with the purposes of the Iowa Civil Rights Act.

## COUNT VI
## VIOLATION OF THE AMERICANS WITH DISABILITIES ACT

170. Plaintiff repleads paragraphs 1 through 169 as if fully set forth herein.

171. Plaintiff was a qualified individual with a disability within the meaning of the Americans with Disabilities Act ("ADA").

172. Plaintiff's depression, anxiety, and PTSD substantially limited one or more of her major life activities.

173. Plaintiff was able to perform the essential functions of her job with or without reasonable accommodations.

174. Plaintiff requested that Defendants reasonably accommodate her disabilities.

175. Defendants discriminated against Plaintiff because of her disabilities.

176. Defendants retaliated against Plaintiff because of her protected activities.

177. As a result of Defendants' acts and omissions, Plaintiff has in the past and will in the future suffer injuries and damages, including but not limited to, emotional distress and lost wages, benefits, future earnings, and other emoluments of employment.

WHEREFORE, Plaintiff demands judgment against Defendants, jointly and severally, in an amount which will fully and fairly compensate her for her injuries and damages, for punitive damages in an amount sufficient to punish Defendants and to deter them and others, for prejudgment and postjudgment interest, attorney's fees, for the costs of this action, for appropriate equitable and injunctive relief, and for such other relief as may be just in the circumstances and consistent with the purposes of the Americans with Disabilities Act.

## COUNT VII
## VIOLATION OF THE FAMILY AND MEDICAL LEAVE ACT (FMLA)

178. Plaintiff repleads paragraphs 1 through 177 as if fully set forth herein.

179. At all times material, Defendants were an "employer" within the meaning of the FMLA.

180. At all material times, Plaintiff was an "employee" within the meaning of the FMLA.

181. Plaintiff has one or more "serious health conditions" within the meaning of the FMLA.

182. Defendants discriminated against Plaintiff for taking FMLA leave.

183. Plaintiff suffered an adverse employment action, including but not limited to constructive discharge.

184. As a result of Defendants' acts and omissions, Plaintiff has in the past and will in the future suffer injuries and damages, including but not limited to lost wages, benefits, future earnings, and other emoluments of employment.

WHEREFORE, Plaintiff demands judgment against Defendants in an amount which will fully and fairly compensate Plaintiff for her injuries and damages, for liquidated damages, for prejudgment and postjudgment interest, for attorney's fees, for the costs of this action, for appropriate equitable and injunctive relief, and for such other relief as may be just in the circumstances and consistent with the purpose of the Family Medical Leave Act.

### JURY DEMAND

COMES NOW the Plaintiff and demands a trial by jury.

/s/ Nathan Borland
TIMMER & JUDKINS, P.L.L.C.
Nathan Borland AT0011802
nate@timmerjudkins.com
Ashley Madsen AT0014921
ashley@timmerjudkins.com
1415 28th Street, Suite 375
West Des Moines, IA 50266
Telephone: (515) 259-7462
Fax: (515) 361-5390
ATTORNEYS FOR PLAINTIFF